RAYMOND FALLSTROM, JR. *vs.* BRADY ELECTRICAL
COMPANY, INC.
(and four companion cases[1]).

Worcester.    April 8, 1964. — June 8, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& REARDON, JJ.

*Proximate Cause. Negligence,* Electrical equipment. *Practice, Civil,* Variance.

In an action by one injured in an explosion allegedly caused by a transformer installed by the defendant in the electrical system of hospital buildings, there was a fatal variance where the declaration alleged "the negligent construction and/or installation" of the transformer, but the proof did not show that the defendant had anything to do with the manufacture of the transformer or any reason to know of any fault in it, or that it had been improperly installed, although it was not functioning properly on the day when the explosion occurred some months later, and the case disclosed by the evidence rested on certain conduct of employees of the defendant with respect to the transformer on the day of the explosion. [605-606]

Evidence did not warrant a finding that any negligence in failing to disconnect a transformer in the electrical system of a hospital when smoke and odor were observed coming from the transformer in the morning of a certain day, or any negligence in opening a panel of the transformer to get more ventilation in the afternoon, was a proximate cause

---

[1] The companion cases are by Robert J. Fanning, Winifred B. Flynn, administratrix, Frederick V. Murphy, and Frederick L. O'Hara against the same defendant.

of an explosion occurring in the early evening in an oil filled meter transformer located some distance away on the same circuit, which was equipped with circuit breakers designed to cut off the current in the event of a major fault in the system. [606–607]

FIVE ACTIONS OF TORT. Writs in the Superior Court dated June 19, 1959.

The actions were tried before *Brogna, J.*

*Samuel Perman* for the plaintiffs.

*David H. Fulton* for the defendant.

SPALDING, J. On July 2, 1957, four firemen were injured and a fifth was killed while fighting a fire on the premises of the Worcester State Hospital. The defendant installed a transformer in one of the hospital buildings. These actions of tort were brought by the four injured firemen and by the administratrix of the deceased fireman.[2] The defendant, it is alleged, "sold and/or installed . . . [a 1,500 KVA] transformer, well knowing that the same was to be used in connection with electrical work and that if it were not properly constructed and/or installed there might be serious damage to others; that on . . . July 2, 1957, by reason of the negligent construction and/or installation of the said transformer" it did not function properly and this caused the injuries, death, and conscious suffering complained of.

We summarize the evidence as follows. The Commonwealth owned and operated a mental hospital known as the Worcester State Hospital on Belmont Street, Worcester. Prior to July 2, 1957, the Commonwealth entered into a contract for the construction of a new building, known as the Bryant Building. This building was accepted on or about May 17, 1957, and on July 2, 1957, was "occupied and . . . in operation." The Commonwealth also entered into a contract for the enlargement and remodeling of a building known as the old Power House. The work was accepted on or about March 13, 1957. Involved in this remodeling was "a change over" from the former method of generating electrical power by the hospital's own generators to a sys-

---

[2] The administratrix seeks to recover for the death and conscious suffering of her intestate.

tem which would enable it to purchase power from the Worcester County Electrical Company (Worcester). The contract for supplying the specified wiring and equipment for this purpose was let to the defendant by the general contractor. This contract also included the installation of the 1,500 KVA dry type transformer (KVA), the wiring and equipment, and the furnishing of an electrical light and power system. But the defendant's contract did not include the furnishing of the metering transformer hereinafter described; this was to be furnished by Worcester and connected by it to equipment provided by the defendant.

"The electric current pertinent to this accident came from a substation of . . . [Worcester] and was transmitted through cables under ground. From these cables various customers were served, including the . . . [hospital] at . . . (13,800) volts." In leaving the substation the current passed through one circuit breaker and in passing through the hospital property the current went through two other circuit breakers (A and B). A circuit breaker is "a large capacity switch, which . . . was designed to operate automatically"; it could also be operated manually. It is actuated by one or more relays. Relays are "electric devices which are set to sense changes in the amount of current flowing in the line." If a ground or other fault, such as a short circuit or excessive current drain, occurs, the relay, through an independent source of power (usually a storage battery) actuates the circuit breaker and causes it to open, thereby cutting the flow of current. The relays here had a short time delay and would sense only trouble which existed beyond their location in the line. The fault or trouble has to be of sufficient magnitude to actuate the relay and must exist for a sufficient length of time to cover the delay to which the particular relay is adjusted.

The accident occurred in the meter room which is in the basement of the Bryant Building. Feeder No. 25 came from the substation and entered the meter room and went immediately into the circuit breaker designated as A and then to a set of metering transformers which were of the oil

filled type. From these transformers the electricity went to another set of transformers which "reduced the voltage to a level suitable for use in providing light and power to the Bryant Building." The current also entered another circuit breaker (B) which was likewise actuated by relays. These relays were set to operate before those on circuit breaker A would operate. From B the current went in an underground cable a distance of about 1,000 feet to the KVA transformer installed by the defendant in the old Power House.

In March, 1957, Worcester started supplying electricity to the hospital through metering transformers which had been installed in May of 1956. These transformers were owned by Worcester. At the request of the defendant the relays on circuit breakers A and B had been tested by Worcester in 1956. All of the equipment described above had functioned without incident prior to the day of the accident.

In a new vault room of the old Power House the defendant had installed the KVA transformer from which various substations were to be supplied. The transformer would be able to reduce the supply to usable voltage, which was about 110 volts. This transformer had a circuit breaker (B) which was operable manually or automatically. The transformer was ordered by the defendant but was of a type specified by the Commonwealth; it had been guaranteed by the manufacturer to carry the required load plus an additional safety factor. Prior to its installation, Worcester, at the defendant's request, had tested the transformer by what is called a "megger" test. This test showed that there was no excess of moisture but it was not designed to, and did not, show whether there was a leakage of current between the windings.

Between 8:45 and 9 A.M. on July 2, 1957, one of the substations was connected to the KVA transformer in the Power House by an employee of the defendant and it began to "smoke and emit an odor." This condition could be "normal for the initial loading of . . . [this] type of trans-

former'' but there was evidence that this condition would not be normal and indicated the ''probability of defect.'' The smoke and odor increased during the day. About 4 P.M. Santomeno, an experienced electrician employed by the defendant, took the bolts out from a metal panel on the side of the transformer and propped it open with a piece of wood. This was done in order to provide more ventilation.

About 6 P.M. Santomeno, who was in the building for another purpose, went to the vault room with a hospital employee where the KVA transformer was located ''in order to see how it was behaving.''[3] According to Santomeno, when his forearm was on the ''inner side of the panel [of the transformer] . . . a flash took place'' and he was burned.

At about that time a loud noise was heard at the Bryant Building where the metering transformer was located. Smoke was seen on the main floor of the building. The basement was also full of smoke and the doors of the vault had blown off their hinges. At 6:33 P.M. the Worcester fire department was summoned to the Bryant Building. Arriving about five minutes later, the firemen went into the meter room which at that time was filled with heavy, black smoke which had an odor of oil. The only thing that could be seen by the firemen was a ''reddish glow.'' Ansul powder, a chemical used in fighting fires where oil or electricity is involved, was applied and the glow ''died down.'' It reappeared in a few minutes and more ansul powder was applied. Thereupon ''a sheet of bright flame arced out and there was a loud noise.'' As a result of this explosion four of the plaintiffs were injured and the plaintiff administratrix's intestate, a district chief, was killed.

At 6:40 P.M. a circuit breaker on feeder No. 25 opened at the utility substation. This indicated a short circuit or grounding on the feeder. Shortly thereafter, the circuit breaker was reclosed by the operator at the substation but it reopened immediately, indicating that the trouble still continued. Thereafter the breaker remained open and the feeder was dead.

---

[3] Santomeno ''was in the building for the purpose of cutting in a line to supply power to the cafeteria from another substation.''

Inspection after the accident revealed that one of Worcester's oil filled metering transformers in the Bryant Building had blown up and that the arcing had occurred between a lead to the transformer and the casing. There was opinion evidence to the effect that a fault in the KVA transformer at the Power House had "triggered the explosion in the metering transformer." There was likewise evidence that "[t]he relay actuating circuit breaker B showed damage by prolonged current flow and the breaker had opened," as it should have. However, the relay actuating circuit breaker A showed no prolonged current flow and the breaker had not opened. There was evidence that the condition of the batteries, which were not under the defendant's control, was "sufficient to account for the failure of circuit breaker A to operate." Other evidence bearing on the possible cause of the explosion will be stated later.

At the close of the evidence the defendant presented motions for directed verdicts, which were denied subject to the defendant's exceptions. The jury returned verdicts for the plaintiffs, which were recorded under leave reserved. Thereafter, the judge on motion of the defendant ordered that verdicts be entered for the defendant. The plaintiffs' exceptions to this action present the sole question for decision.

The defendant argues that there was a fatal variance between the pleadings and the proof. We are of opinion that the action of the judge could very well rest on this ground. *Sandler* v. *Elliott,* 335 Mass. 576, 581, and cases cited. The averments of the declaration are that the defendant's negligence consisted in either (a) the improper installation or (b) the faulty construction of the KVA transformer. The evidence would not warrant a finding of improper installation. The fact, without more, that the transformer was not functioning properly on the day of the explosion was not evidence of improper installation at an earlier date. It could have resulted from other causes, including improper construction, for which the defendant would not be answerable. The defendant had nothing to do with the manufacture of the transformer and had no reason to know of any

defect in it, if there was one. The transformer "was of a type specified by the Commonwealth and had been guaranteed by the manufacturer to carry the required load, plus an additional safety factor." There can be no doubt, therefore, that the case pleaded was not the case proved. We prefer, however, to rest our decision on broader grounds.

The plaintiffs in this court appear to have abandoned the theory set forth in their pleadings and do not press arguments about the installation or construction of the transformer. They now contend that the defendant, by the conduct of its employees on the day of the accident, "created a situation of special danger by violating basic standards of safe practice in the electrical industry" which foreseeably could have, and in fact did, cause the harm sustained by the plaintiffs. The plaintiffs first argue extensively that their status at the time of the accident was that of invitees to whom the defendant owed the duty of ordinary care. Since the result will be the same, we assume, arguendo, that the plaintiffs' status was such as to permit recovery on the basis of ordinary negligence. See, however, *Aldworth* v. *F. W. Woolworth Co.* 295 Mass. 344; *Wynn* v. *Sullivan,* 294 Mass. 562.

We shall also lay to one side the defendant's contention that, since the defendant's employee Santomeno was on the hospital premises to perform other work, anything that he did or failed to do concerning the transformer was beyond the scope of his employment, and we shall assume the agency point in the plaintiffs' favor.

The plaintiffs now rest their cases on two acts of the defendant's employees. There was evidence that an employee of the defendant observed smoke and odor emanating from the KVA transformer between 8:45 and 9 A.M. and failed to disconnect it. Assuming that he was negligent in failing to disconnect the smoking transformer and assuming that a fault in that transformer had "triggered" the explosion of the metering transformer, there is no evidence that the failure to disconnect the KVA transformer was the proximate cause of the ultimate explosion in the metering

transformer.  Certainly such a result was not foreseeable in view of the two circuit breakers (A and B) designed to turn off the current in the event of a major fault in the system.  There is evidence that circuit breaker B, which we infer was designed to cut the KVA transformer out of the line if there was any major fault, did in fact open, although there is no evidence of when that happened.  There is also evidence that circuit breaker A, which we infer was designed to open if there was any major fault in the metering transformer which finally exploded, did not open because of defects not chargeable to the defendant.

It may well be that the proximate cause of the explosion was the failure of circuit breaker A to open which allowed the metering transformer to continue to draw power and heat up until it exploded.  In a situation involving a complicated electrical circuit with many factors possibly relevant to the explosion, the plaintiffs have left to conjecture the proximate causal relation between the failure of the defendant's employee to disconnect a smoking transformer and an explosion of a different transformer on the same circuit.  *Glassman* v. *Hamel,* 341 Mass. 422, 425.  The plaintiffs have failed to meet their burden of proving that there was a greater likelihood that the injuries resulted from the negligence of the defendant than from some other source for which it would not be liable.  *Rocha* v. *Alber,* 302 Mass. 155, 157–158.

The plaintiffs also rely on the evidence that Santomeno, a few hours before the explosion, propped open the panel of the KVA transformer with a piece of wood.  There was evidence that it was good practice "never . . . [to open] up a panel or otherwise . . . [expose] any live wiring or equipment" and that it was "dangerous to insert anything between the equipment carrying current and the ground shield; . . . [as] this might start an arc."  But there is no evidence of any causal connection between those acts and the explosion of the metering transformer.

*Exceptions overruled.*